D. Blair Clark
LAW OFFICES OF D. BLAIR CLARK PLLC
1513 Tyrell Lane, Suite 130
Boise, ID 83706
Phone: (208) 475-2050
Fax: (208) 475-2055
Email dbc@dbclarklaw.com
Idaho State Bar No. 1367
Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>VAL R. COVERSTONE and<br>TERESE D. COVERSTONE,<br><br>Debtor(s). | Case No.  09-02059-TLM<br><br>Chapter 13 |

### DEBTOR'S MEMORANDUM IN OPPOSITION TO TRUSTEE'S OBJECTION TO CONFIRMATION AND MEMORANDUM IN SUPPORT THEREOF

STATEMENT OF THE CASE:

This case comes before the Court on Debtor's Amended Chapter 13 Plan, docket 76, which is an amendment of that filed as docket 48 on March 4, 2010.  The Trustee has objected by her Trustee's Objection to Confirmation, docket 81, and her Memorandum in support of her Objection, docket 82.  Debtors oppose the filing of either the Memorandum or the Objection, as the Trustee has failed completely to respond to Debtors' discovery requests previously submitted. The Trustee has also failed to comply with the directive of this Court to file her documents by

July 5. However, Debtors recognize that they need to respond to these late documents nonetheless.

Both Debtors will be in attendance to present evidence in support of confirmation should the Court deny the Motion to Strike the Objection, filed herewith.

Some of the briefing in this Memorandum has been submitted previously, but Debtors are submitting the germane portions again to assist the Court in preparing for this hearing. Counsel apologizes for the redundancy, but felt that the Court would find it easier to deal with one document than several submitted previously.

Debtors are above-median income debtors. They not only support themselves, but provide the majority of the support for their grandchildren. Their daughter, Brittany, has moved in with them following her divorce. The daughter has only recently obtained a job, but the income from that job does not provide for the majority of the support needs for the grandchildren. Their former son-in-law has now started payment of child support, but again, her needs are such that require the Coverstones to pay most of the support for their extended family. They also have a disabled son for whose benefit they make periodic gifts averaging $150 per month to pay for his necessities. The Trustee believes that such actions are bad faith; debtors vehemently dispute this.

The Trustee has requested detailed proof that Debtors' son is "unable to pay his own way or that been giving him support both before and after the filing of this case. [sic]" Debtors are prepared to testify as to his condition, his living situation, and how they pay things for his benefit. Debtors respectfully submit that the Trustee is so prejudiced against this case that

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 2
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

nothing that has been furnished will suffice for her purposes. Debtors are prepared to testify as to these matters. They do not pay sums directly to him in cash or check, because doing so could well result in his loss of his benefits and would do a great deal of harm to his welfare.

Specific objections made by the Trustee as respects various payments are discussed hereafter. However, Debtors believe that since overall 'good faith' is an issue, the reasons for filing this case should be considered in an overview.

As will be discussed in more detail below, Mr. Coverstone worked for 26 ½ years for Ford Motor, and was the branch manager for Ford Motor Finance in Fargo, ND until the office was closed. He then obtained a position with United Auto Credit in Boise, but that store was closed within a year after he took the job as part of United's substantial downsizing. He was able to obtain a position with Wells Fargo in Boise. Mrs. Coverstone is an employee of the Ada County Sheriff's office. They have been married for 35 years.

Their 2007 tax return, which they prepared with "TurboTax" as was done normally, showed that they would receive a refund of over $2,500. However, in April, 2009, the IRS advised them that the return was incorrectly prepared, and they owed over $7,000 in taxes for 2007. In the same time frame, their daughter, Brittany, contacted them and said that her husband, a new but unemployed attorney, was divorcing her and paying her nothing. She had no job, no income, and no way to support herself or her three children. The Coverstones helped her move to Boise; their former son-in-law moved to Louisiana to be with his new 'girlfriend' and paid nothing for his former wife or his children.

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 3
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

Far from being in good financial condition, the Coverstones found that their financial position had severely deteriorated in literally one month. They also found themselves caught up, as so many have been, in the real estate decline and found their house worth over $150,000 less than they paid for it, with a second mortgage they could no longer afford.

The Plan proposes that they retain their home, strip the second mortgage, surrender their motorcycle and the loan financing it, pay their taxes and a dividend toward unsecured claims.

The Trustee has objected to their retaining their home, their cars, helping their family, paying 2009 taxes, and to their good faith in proposing this Plan. The facts, however, show that the Trustee's objections should be overruled and the Plan confirmed.

SPECIFIC OBJECTIONS: The Trustee objects (docket 81) on various grounds. Debtors will attempt to identify and respond to each.

    A.    RETENTION OF RESIDENCE AND VEHICLES: In paragraph 4, p. 1, she objects to the Debtors' retention of their home, claiming somehow that this discriminates against the unsecured claims. However, the Trustee cites no authority in support of this position. It is expected that she will rely on Judge Pappas's decision in In re Stitt, 08.4 IBCR 167. However, that decision, if indeed that is her authority, does not support her position. That case, as the Court noted in Varner, 09.2 IBCR 52, was a decision analyzing the 'totality of the circumstances,' not a decision against Debtor maintaining his home for lack of equity. The issue in Stitt was not just the house; it was also the extra expense for transportation and other expenses for maintaining the house, which was allegedly needed to operate a horse business that lost

money. Debtors' counsel has found no authority that mandated that debtors surrender their residence in order to obtain confirmation.

When the Debtors came to Boise, they purchased this house for $570,000 (which shows how times have changed). They put 20% down, from their own savings. They actually believed they were saving money by so doing, as they could avoid the mortgage insurance premiums. At the time they bought the house, Mr. Coverstone believed that with bonuses and incentives, he would actually be making between $100,000 and $125,000 annually. Mrs. Coverstone found employment with the Ada County Sheriff. They had two salaries and no financial needs.

They also believed that this house was an excellent investment. Mr. Coverstone will testify that he had lost a substantial sum of money in his 401K and pension, and believed that real estate, especially for homes in this price range, were far better investments. It was also to be their retirement home. This is far from the situation in <u>Stitt.</u>

The situation with the vehicles is also submitted as 'bad faith' by the Trustee, but under the circumstances of the case are not. When his position with Ford was eliminated, he was still allowed the "A" plan for purchase of these vehicles. This means he could get them for 2 ½% less than dealer cost, plus any rebates available. His vehicle is a Lincoln pickup, which when so purchased, was cheaper to get than a F-150 pickup. Her vehicle is a Lincoln crossover SUV which replaced a Lincoln Zephyr that she had at the time, but which she felt was unsafe for her to drive.

The vehicles were originally leased, but were converted to purchases when Mr. Coverstone was advised by his associates at Ford Finance to do so. They advised him that the

upcoming purchase leases and contracts would be substantially more expensive than what he had, and that he may not have all of the benefits of his 'A' Plan. They therefore converted these leases to purchase contracts. At the time, the vehicles had full bumper-to-bumper warranties, and were believed to be something that they could get and keep for a long period of time. Again, at the time this was done, they believed they had no financial worries.

B.   PAYMENT OF CHARITABLE EXPENSES: On p. 3, the Trustee states that the Debtors have failed to file this case in good faith. One of the factors on which she relies is that they "did not make any charitable contributions last year or this year but belive they are entitled to take the deduction as long it is less than $15% of their income. [sic]"

Debtors <u>do</u> believe that to be the law, because this Court has ruled that it is. Although counsel has attempted to find the name of the case, the hearing occurred January 21, 2010 in this Court (counsel was present; Mr. Coffey was the Debtor's counsel). The Coverstones are LDS, and tithing is something that is an important tenet of their religion. The amount proposed is far less than 15% of their income as allowed. This Court has rejected the Trustee's argument in an oral ruling in the case referred to above, citing, among other authorities, <u>In re Cavanagh</u>, 242 B.R. 707 (Bankr. D. Mont. 2000), <u>affirmed</u>, 250 B.R. 107 (B.A.P. 9th Cir. 2000). The amount claimed is far less than the maximum allowed by the Code, and, as Judge Kirscher noted, there is no difference between new or increased contributions. The trustee's 'bad faith' argument was rejected in that case, and should be rejected here. The tithing proposed is 4.0% of Schedule I, Gross Income, and 5.2% of line 11 of Form 22C. And again, the case law, which this Court has followed recently, states that whether tithing has been paid previously or not is not relevant to the

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 6
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

determination. Contrary to the Trustee's position, Line 45 does <u>not</u> require proof that the Coverstones have been tithing previously. So long as the tithing is within the statutory limitations, it is proper. Trustee's statements that the Debtors have "refused to provide proof of said contributions since the date of filing the case" is a red herring. The Trustee concedes in her Objection that they did not make any such contributions in 2009. Since they can do so in 2010, and since this would be a tax benefit to them, they are making such contributions in 2010. No more than this is required to be submitted. They will testify that they have tithed until 2009 in the amount requested or more, and will testify concerning 2010 tithing. This Objection should be denied.

      C.    SUPPORT FOR DAUGHTER AND CHILDREN: The issues in this case are further complicated by the Trustee's insistence that this is a case involving a family of two. It is not; it is a situation involving a family of six. At the time of the confirmation hearing, and for months prior to this date, the family consisted of Mr. and Mrs. Coverstone, their daughter, and three children eight years of age and under.

      The Trustee would have this Court adopt a per se rule that a debtor can <u>never</u> assist adult children. However, Debtor's counsel has found no case law adopting such a rule. The cases that hold that such expenses are unreasonable are based on a "totality" rationale, not a "per se" ruling. This Court has held in <u>In re Bauer</u>, 04.1 IBCR 38, that this issue should be determined on a case-by-case basis, as that is the proper method for determining disposable income issues. The Court then reviewed various cases that upheld, and did not uphold, payments for such dependents, and after reviewing the nature of the relationship and the reason for the payment, upheld that

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 7
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

expenditure. The Court also examined other aspects of Debtor's budget, as this Court will do in this case as well. This should dispose of the issues regarding both the daughter and the grandchildren, and the disabled son.

To reiterate the rationale for this payment, Brittany and her children came to them following he daughter's divorce. Until this spring, her former husband provided no support whatever, and she had no job. Brittany has only recently obtained a job paying $16 per hour; she has also obtained a garnishment from the Idaho Department of Health & Welfare for child support of $800 per month. However, her financial needs are such that her income only allows her to pay for her daycare, car payment, medical bills, and some purchases of groceries. She cannot pay for housing, utilities, the remainder of the food and clothing budget for herself and her children, school expenses, or the like. Mr. and Mrs. Coverstone have discussed the situation with their daughter and are convinced that she is paying them what she can. The nature of the family need and the relationship between Debtors, their daughter and her children (their grandchildren) certainly gives credence to the 'good faith' deduction of this expense, and the reason for declaring this to be a six-member family, not two.

D.  SUPPORT FOR SON:    The Coverstones' have an adult son, Josh. Josh suffers from a disability referred to as "Hermansky Pudlak Syndrome," which is a form of albinism. He is legally blind. He has had the disability since birth and has been determined by the Social Security Administration to be permanently and totally disabled. He is therefore receiving SSI.

Debtors make gifts of money from time to time, averaging approximately $150 per month. They cannot be considered as "contributions" as this would jeopardize his SSI. The

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 8
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

Coverstones call them "gifts" to avoid this problem.  The payments are usually in cash, to use for payments for food at supermarkets, clothing and necessities.  They have paid on his telephone bill, and in one case purchased a mattress for him.  Josh lives with two friends as he is trying to be as independent as possible.   The disability determination has been submitted to the Trustee.  She still persists in objecting that this is inadequate to show that he is unable to pay his own way.

Debtors would respectfully point out that inability to work is the reason for the determination.  He has extreme photosensitivity and cannot see or work in places which are lighted.  Again, Mr. and Mrs. Coverstone are not <u>unreasonably</u> assisting their son, and these expenses are valid expenditures for the debtors or a dependent of the debtors.

E. INADEQUACY OF NOTICE FOR 'STRIP DOWN' OF SECOND MORTGAGE:   Service was made upon Washington Mutual-Chase (re loan 747344899) by certified mail to Chase Bank, ATTN: Jamie Dimon, CEO/Pres., 270 Park Avenue New York NY 10017-2070."  Service was thus proper.  The language has been upheld by this Court in <u>In re Davidson</u>, 09.3 IBCR 101.   The Plan contained the loan number of the unsecured junior lien to be "stripped."  There are no defects with the service, or with the notice itself.

F. ATTORNEYS' FEES:   Debtor's Counsel has no objection with providing a detailed fee request following the confirmation, nor to this Court determining the amount to be allowed, nor a payment schedule.  The unfortunate situation is that from Debtor's perspective, the Trustee's position from day one has been that they could not keep their home or vehicles, could not help their children, and could not tithe.  However, all of these factors are vitally

important to Debtors, and they have the right not only to advocate their positions, but to pay for those costs, especially when they have been exacerbated by the Trustee's entrenched positions.

As a case in point, this Court noted that the Trustee had the right to use the discovery rules to glean information she claimed she did not have. However, when Debtors attempted to do the same, and to pare down the issues in this case, Debtors were completely ignored. This is far from fruitful.

G.   TIMELINESS OF OBJECTIONS AND BRIEFING: The Court ordered the parties to submit briefing, witness and exhibit lists by July 5. Debtors' exhibits have not changed, nor had their briefing, except with regard to the Motion for Summary Judgment. And those were filed well before July 5. Trustee to this day has not objected properly to the motion for summary judgment, and her response to the motion did not comport with Rule 7056.1 in any manner. She has filed a brief in support of a nonexistent Objection, and no supporting documentation. Regardless of how the Court rules on the issue of service, the motion is still properly submitted and NOT properly responded to.

H.   DOES <u>LANNING</u> CHANGE THE RESULT? Debtors believe it does not. The Supreme Court decision in <u>In re Lanning</u>, (Supreme Court docket 08-998, 2010 U.S. LEXIS 4568) . The decision tells us:

> 1.   (Quoting from Collier's): "As with the income side of the budget, the court must simply use the debtor's current expenses, *unless a change in them is virtually certain*" (emphasis added)). Indeed, petitioner (the Trustee) concedes that courts possessed this discretion prior to BAPCPA.

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 10
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

    2.    "In cases in which a debtor's disposable income during the 6-month look-back period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended."

    3.    "And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements."

<u>Lanning</u> not only followed the "forward looking" approach, but did so urging the Courts to look at a Debtor's budget, making such changes as are reasonably necessary due to fluctuations in income or expenses that are foreseeable. The Supreme Court did not make a ruling such as the Trustee would urge the Court to do in this case.

    I.    POSTPETITION TAXES:    Trustee objects to paying postpetition taxes from the Plan. However, the postpetition tax claim is properly payable under 11 USC §1305(a)(1). The tax bill was unanticipated, and results in a payment being necessary for 2009 taxes, <u>and</u> extra withholding for 2010 taxes. This is the reason why the payment proposed has declined since the original Plan was filed. The Trustee is mischaracterizing the payment under the Plan and the disclosure in the revised budget as the same thing; they are not. The payment under the Plan is for the 2009 Federal income tax. The only part of the extra 'budget' item to be paid is the State income tax, which Debtors were going to try and pay themselves. However, they do not oppose the Trustee paying it. The Federal amount payable is simply disclosed for information; there is

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 11
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd

no <u>expense deduction</u> provided in Schedule J. The extra withholding in Schedule I is to cover such shortfalls for 2010 and subsequently. It cannot be bad faith to attempt to provide for payment of the tax claims.

  J. LIFE INSURANCE: The Coverstones will testify that the life insurance paid by payroll withholding and from the payments from Mr. Coverstone's pension plan are all term insurance. The premiums are perhaps higher than the Trustee is used to seeing, but Mr. Coverstone is 56 years of age, and the death benefits are substantial. The premiums will increase in two years, and two years after that.

  K. PENSION INCOME: The Trustee's asserts that the pension income is understated for purposes of the Form 22C. This is incorrect. The Trustee is not considering that most of the pension plan was contributory, of the type that this Court has determined in <u>In re Cram</u> 09.2 IBCR 48 should not be included in the Form 22C calculation. Of the income from this pension of $3,257.67, $2,711.87 is the contributory portion. $99.17 is the non-contributory portion. The difference of $1,304.76 is a temporary 'incentive' for the early retirement, that will terminate when Mr. Coverstone qualifies for Social Security. Thus, the exclusion of the bulk of the pension income from Form 22C is appropriate. The Amended Form 22C reflects this analysis.

  Dated this 12th day of July, 2010.

LAW OFFICES OF D. BLAIR CLARK PLLC

/S/
D. Blair Clark

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2010, I caused to be served a true and correct copy of the foregoing by the method indicated below, and addressed to the following:

All registered ECF participants, including Kathleen McCallister, Trustee.

/S/
D. Blair Clark

DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION– Page 13
M:\MB\mbwork\Blair\Coverstone, Val & Terese\Trial Brief 7-12-10.wpd